**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**GARY ANDREW SULLIVAN,**

      **Petitioner,**

**v.**                             **Case No. 1:17cv017-MW/CAS**

**JULIE L. JONES, Secretary,
Florida Department of Corrections,**

      **Respondent.**

_____/

## <u>REPORT AND RECOMMENDATION TO DENY § 2254 PETITION</u>

On January 26, 2017, Petitioner Gary Andrew Sullivan, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. Petitioner ultimately filed a second amended § 2254 petition. ECF No. 19. On April 16, 2018, Respondent filed an answer and exhibits. ECF No. 34. Petitioner has not filed a reply, although he was given the opportunity to do so. *See* ECF No. 33.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B). After careful consideration of all issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this case. *See* Rule 8(a), R. Gov.

§ 2254 Cases in U.S. Dist. Cts.   For the reasons stated herein, the pleadings and attachments before the Court show Petitioner is not entitled to federal habeas relief, and this § 2254 petition should be denied.

## Background and Procedural History

On May 9, 2011, a grand jury in the Eighth Judicial Circuit, Levy County, Florida, returned an indictment charging Petitioner Sullivan with first degree murder, in violation of section 782.04(1)(a), Florida Statutes, in connection with events that took place on or about April 8, 2011, resulting in the death of Summer Keller, by manual strangulation.   Ex. A at 21-22.[1] Sullivan proceeded to a jury trial in February and March 2012.   Exs. C (jury selection), D-G (transcript of jury trial).   Sullivan did not testify.   Ex. F at 557-58.   On March 1, 2012, the jury returned a verdict finding him guilty of manslaughter, a lesser included offense.   Ex. A at 64; Ex. G at 711-13.   At proceedings held March 29, 2012, the trial judge found Sullivan qualified for sentencing as an Habitual Violent Felony Offender, adjudicated him guilty, and sentenced him to thirty (30) years in prison, with a minimum mandatory

---

[1]Hereinafter, all citations to the state court record, "Ex. –," refer to exhibits submitted with Respondent's answer, ECF No. 34.

Case No. 1:17cv017-MW/CAS

term of ten (10) years.   Ex. A at 115-20; Ex. G.

Sullivan appealed his judgment and sentence to the First District Court of Appeal (DCA), assigned case number 1D12-1784.   Ex. H (Initial Brief), I (Answer Brief), J (Reply Brief).   On March 28, 2013, the First DCA per curiam affirmed the case without a written opinion.   Ex. K; Sullivan v. State,   So. 3d 148 (Fla. 1st DCA 201) (table).   Sullivan filed a motion for rehearing, Ex. K at 2-4, which the First DCA denied by order on April 26, 2013, *id.* at 5.   The mandate issued May 14, 2013.   *Id.* at 7.

In the meantime, on September 17, 2012, through counsel, Sullivan filed a Motion to Correct Sentence Pursuant to Rule 3.800(b)(2).   Ex. L at 3-12.   By order rendered September 24, 2013, the state trial court denied the motion.   *Id.* at 13-14.

On July 1, 2013, Sullivan, proceeding pro se, filed a Motion to Correct Illegal Sentence pursuant to Florida Rule of Criminal Procedure 3.800(a). *Id.* at 18-22.   By order dated July 11, 2013, the state trial court denied the motion.   *Id.* at 23-24.   Sullivan appealed to the First DCA and that court affirmed the case per curiam without a written opinion.   Ex. M.   The mandate issued March 5, 2014.   *Id.*

On August 22, 2013, Sullivan filed a motion for postconviction relief

pursuant to Florida Rule of Criminal Procedure 3.850.   Ex. N at 1-19.   He

subsequently filed a supplement to the motion.   *Id.* at 20-55.   By order

rendered September 10, 2014, the state post-conviction trial court granted

an evidentiary hearing on five of Sullivan's claims and summarily denied

the remaining two claims.   *Id.* at 90-98.   The court appointed counsel to

represent Sullivan at the hearing.   *Id.* at 97.   The evidentiary hearing took

place on April 8, 2015.   Ex. Q (transcript of hearing).   Thereafter, by order

rendered June 3, 2015, the state post-conviction court denied post-

conviction relief.   Ex. P at 352-76.

Sullivan appealed the denial of post-conviction relief and, through

counsel, filed an initial brief in case number 1D15-3034.   Ex. S.   The State

filed an answer brief.   Ex. T.   The First DCA per curiam affirmed the case

without a written opinion on July 19, 2016.   Ex. U at 1; <u>Sullivan v. State</u>,

197 So. 3d 47 (Fla. 1st DCA 2016) (table).   The mandate issued August

16, 2016.   Ex. U at 2.

As indicated above, Sullivan filed a § 2254 petition in this Court on

January 26, 2017.   ECF No. 1.   He ultimately filed a second amended

§ 2254 petition.   ECF No. 19.   He raises four grounds:

(1) **Actual Innocence/Judgment of Acquittal**:   "A miscarriage of justice has occurred violating First, Fourth, Fifth, Sixth and Fourteenth Amendment rights," where (a) Petitioner "is actually innocent and counsel denied him access to the courts seizing a property right to form defenses violating equal protection and due process" and (b) "[t]he trial court erred by denying a judgment of acquittal."   *Id*. at 15.

(2) **Prosecutorial Misconduct**:   "Trial court denied [Petitioner] his Fifth, Sixth and Fourteenth Amendment rights" by allowing "prosecutorial misconduct of bolstering witness credibility and witness attacks on [Petitioner's] credibility that rise to fundamental error that is not harmless requiring no objection, though some objection was made."   *Id.*

(3) **Hearsay**:   "Florida's evidence section 801.2 (2d ed. 1984) abridges the Fifth Amendment and class action is requested under the Fourteenth Amendment," where "Florida officers of court misuse Florida evidence code of hearsay exceptions when hearsay can be admitted in front of a jury when not offered for the truth of the matter asserted as was done in this case by the prosecutor during the medical examiner and detectives testimony."   *Id*. at 15-16.

(4) **Ineffective Assistance of Counsel**:   "Defense counsel denied [Petitioner] his Sixth Amendment rights," where counsel "failed to secure an expert witness for a second opinion [as] to cause of death when [the] manner could not be conclusively attributed to State's theory of murder."   *Id*. at 16.

Respondent filed an answer and exhibits.   ECF No. 34.

## <u>Analysis</u>

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant

habeas corpus relief for persons in state custody.    Section 2254(d)

provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).    *See, e.g.,* Cullen v. Pinholster, 563 U.S. 170, 180-83

(2011); Gill v. Mecusker, 633 F.3d 1272, 1287-88 (11th Cir. 2011).    "This is

a 'difficult to meet' and 'highly deferential standard for evaluating state-

court rulings, which demands that state-court decisions be given the benefit

of the doubt.'"    Cullen, 563 U.S. at 181 (quoting Harrington v. Richter, 562

U.S. 86, 102 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).

This Court's review "is limited to the record that was before the state court

that adjudicated the claim on the merits."   *Id.*

For claims of ineffective assistance of counsel (IAC), the United

States Supreme Court has adopted a two-part test:

> First, the defendant must show that counsel's performance was
> deficient.   This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment.   Second,
> the defendant must show that the deficient performance
> prejudiced the defense.   This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial,
> a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).   To demonstrate

ineffectiveness, a "defendant must show that counsel's performance fell

below an objective standard of reasonableness."   *Id.* at 688.   To

demonstrate prejudice, a defendant "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different."   *Id.* at 694.   "A reasonable

probability is a probability sufficient to undermine confidence in the

outcome."   *Id.*   For this Court's purposes, importantly, "[t]he question 'is

not whether a federal court believes the state court's determination' under

the Strickland standard 'was incorrect but whether that determination was

unreasonable – a substantially higher threshold.'"   Knowles v. Mirzayance,

556 U.S. 111, 123 (2009) (quoting <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473
(2007)).   "And, because the <u>Strickland</u> standard is a general standard, a
state court has even more latitude to reasonably determine that a
defendant has not satisfied that standard."   *Id.*   It is a "doubly deferential
judicial review that applies to a <u>Strickland</u> claim evaluated under the
§ 2254(d)(1) standard."   *Id.*

### <u>Ground 1</u>: Actual Innocence/Judgment of Acquittal

In his first ground, Petitioner Sullivan asserts he is actually innocent
and the trial court erroneously denied his motion for judgment of acquittal
(JOA).   ECF No. 19 at 15.   As Respondent indicates, Sullivan raised this
claim, at least the portion challenging the denial of the JOA, in his direct
appeal.   ECF No. 34 at 29; *see* Ex. H at i, 22-26 (Initial Brief).   As
Respondent also indicates, however, the claim raised in state court did not
include any federal authority or argument based on federal law.   *See* ECF
No. 34 at 29; Ex. H at i, 19, 22-26 (Initial Brief).   <u>O'Sullivan v. Boerckel</u>,
526 U.S. 838, 842 (1999) ("Before a federal court may grant habeas relief
to a state prisoner, the prisoner must exhaust his remedies in state court.");
<u>Woodford v. Ngo</u>, 548 U.S. 81, 92 (2006) ("[I]f state court remedies are no
longer available, . . . those remedies are technically exhausted, . . . but

exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court; instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding."). *See also, e.g.*, McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) ("McNair's references to federal law in his state habeas proceedings are exactly the type of needles in the haystack that we have previously held are insufficient to satisfy the exhaustion requirement."); Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001) ("[I]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable."); Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010) (explaining "[a] federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation" or if fundamental miscarriage of justice exists because "'a constitutional violation has probably resulted in the conviction of one who is actually innocent'" (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986))).

Petitioner has not demonstrated cause and prejudice for the default.

Assuming Sullivan presented and exhausted the denial of the JOA as a federal claim, or has shown cause and prejudice for any default, the First DCA affirmed the direct appeal without a written opinion.   Ex. K.   This constitutes a ruling on the merits and is entitled to AEDPA deference.   *See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The record reflects the State presented sufficient evidence and testimony, viewed in a light most favorable to the prosecution, such that the jury could have found beyond a reasonable doubt that Sullivan killed the victim by strangulation, rather than the victim having committed suicide by hanging.   *See, e.g.,* Ex. F at 446-504; *see also* analysis of Ground 4, *infra*. *See, e.g.,* Johnson v. Alabama, 256 F.3d 1156, 1172 (11th Cir. 2001) (explaining that, in federal habeas review of sufficiency of state evidence, "[t]he question we ask is very limited: whether after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the petitioner guilty beyond a reasonable doubt" and "[a]lthough each element of the offense but be established beyond a reasonable doubt . . . the State is not required to rule out every hypothesis except that of the guilt of the defendant" and, further, "federal courts must defer to the

judgment of the jury in assigning credibility to the witnesses and in weighing the evidence"); U.S. v. Herrera, 931 F.2d 761, 763 (11th Cir. 1991) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.").   Accordingly, the trial court did not err in denying the JOA motion.   *See, e.g.*, Donaldson v. State, 722 So. 2d 177, 182 (Fla. 1998) ("The fact that the evidence is contradictory does not warrant a judgment of acquittal since the weight of the evidence and the witnesses' credibility are questions solely for the jury."); State v. Nichols, 892 So. 2d 1221, 1228 (Fla. 1st DCA 2005) ("The witnesses credibility and the weight of the evidence are questions for the jury.").

Further, to the extent Sullivan raises here a freestanding claim of "actual innocence," such a claim, if proved in federal habeas, only allows a petitioner to overcome a procedural bar so that the court may consider petitioner's federal constitutional claim on the merits.   *See, e.g.,* McQuiggin v. Perkins, 133 S.Ct. 1924, 1928 (2013).   "Claims of actual innocence based on newly discovered evidence have never been held to state a

ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993); *see* McQuiggin, 133 S.Ct. at 1931 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."). *See also* Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1356 (11th Cir.2007) (explaining, after declining to consider freestanding claim of actual innocence because it did not fall within the certificate of appealability order, "our precedent forbids granting habeas relief based upon a claim of actual innocence, anyway, at least in non-capital cases").

Based on the foregoing, Sullivan has not shown that, even if considered on the merits, the state courts' ruling rejecting this claim resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(1)-(2). This ground should be denied.

## Ground 2: Prosecutorial Misconduct

In his second ground, Petitioner Sullivan asserts the prosecutor

improperly bolstered witness credibility.   ECF No. 19 at 15.   Respondent

answers that "[i]f this claim were to be exhausted it would have to refer to

the second issue raised in the direct appeal."   ECF No. 34 at 31.   Notably,

as with the first ground, this ground as raised in state court did not include

any federal authority or argument based on federal law, and thus has not

been exhausted as a federal claim.   *See* Ex. H at i, 19, 27-32 (Initial Brief);

O'Sullivan, 526 U.S. at 842; Woodford, 548 U.S. at 92.

In that second point on appeal, Sullivan asserted, "The trial court

erred, reversibly, by denying appellant's motion to exclude hearsay

statements introduced through Detective Anderson who repeatedly

conveyed the medical opinion that Summer Keller [the victim] did not

commit suicide; the hearsay statements were unduly prejudicial because

this was the central dispute at trial and Anderson's statements served to

bolster the credibility of the medical testimony while at the same time

calling appellant a liar."   Ex. H at I; *see id.* at 20-21, 27-32.   As indicated

above, the First DCA affirmed the direct appeal without a written opinion.

Ex. K.   This constitutes a ruling on the merits and is entitled to AEDPA

deference.   *See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The record reflects that, during the trial, defense counsel raised a

hearsay objection to the State introducing into evidence a recording of

Sullivan's interview by law enforcement investigators:

> Your Honor, I think the only issue was the – there's a recorded interview with Mr. Sullivan involving Detective Anderson and Narayan, and there are some statements that they make in that interview to Mr. Sullivan, and I think it's part of either investigative techniques in trying to elicit the information that they want or whatever, but they are making some statements and claims that – information they received from someone else.
>
> And my argument is is that if that is entered into evidence, then it's placing into evidence something that has not been substantiated and not facts, and it also would be hearsay because we have not had any testimony from those people.
>
> Now, I don't know at what point the State intends on entering the interview, if at all, but just in an abundance of caution, to try to address it before it comes up as an issue, that's what I wanted to bring before the Court.

Ex. E at 243.    The prosecutor responded the interview statements were

not hearsay:

> The only legal objection I've heard to this point that Mr. Bryant [defense counsel] has raised is hearsay.    Your Honor, it's not hearsay.    Hearsay is an out-of-court statement offered for the truth of the matter asserted.    Those statements made by Investigator Anderson to the defendant are not being offered for the truth of the matter asserted; they're simply asking the defendant questions in regards to testimony or statements that they may have heard from other people, but they are not being offered for the truth of the matter asserted.
>
> In order for something to be excluded as hearsay, that

out-of-court statement made by the declarant must be offered for the truth of the matter asserted.

Under Mr. Bryant's contention anything in that interview other than the defendant's statement would be inadmissible because it's all hearsay, and that's not a legal ground for excluding the interview, Your Honor.

*Id.* at 244.   Defense counsel further explained his position, asserting the

statements are prejudicial to Sullivan:

Judge, it's not a question that they're asking Mr. Sullivan.

In their investigative technique and in interviewing him, they tell Mr. Sullivan that they have information from doctors and nurses at the hospital and the medical examiner and saying that it is a scientific fact that it could not have happened the way that he is saying that it happened.   And I think that that is prejudicial to him; it's assuming a fact not in evidence, and I also – and they're also making claims based on what they're saying someone told them.   And that's why I also included the hearsay objection.

I think it would be prejudicial to my client because there are – you know, they're saying multiple people, and as far as I know, the only person that has made any claim in regards to this not being able to have happened the way he stated is based on the testimony of the medical examiner.   And if the medical examiner takes the stand and makes the statement, then I could understand that portion where they're saying the medical examiner, but they're saying there's doctors and nurses and a medical examiner that said it was impossible for it to happen that way, and they keep saying and talking over him, saying it's a scientific fact.   And I would argue that that would be prejudicial, and it should not be admitted.   It's assuming a fact not in evidence, for one, and if they are talking about statements that were given to them by someone else, it would

also fall under hearsay.

*Id.* at 244-46.   The prosecutor responded that it is not hearsay, and it is not "so prejudicial that it outweighs any probative value," and also pointed out that defense counsel "can cross-examine the investigators as to those techniques," that is, the "well-founded law enforcement techniques to lie to suspects when they're interviewing them to attempt to get them to say something that they might not have said."   *Id.* at 246.   The judge asked if Investigator Anderson, who did the majority of the interview, would be called as a witness and the prosecutor responded that he would be and the prosecutor would be "entering that statement in through Investigator Anderson and playing it for the jury."   *Id.* at 247.   The judge asked if Investigator Anderson would be subject to cross-examination and the prosecutor responded, "Absolutely, yes, sir."   *Id.*   The judge then denied the motion "for those reasons," finding "it isn't hearsay" and "case law does confirm that that's a legitimate technique."   *Id.*   The judge further explained:

> [A]nd the biggest reason is you can cross-examine him all you want about whether that was a truthful statement that dozens of people or whatever it is claim they saw whatever they saw. Overruled.   The motion to exclude – in fact, the motion to exclude it is denied.

*Id.*

Just before Investigator Anderson's testimony, the prosecutor

explained they had "been able to redact portions of it which were prejudicial

and also portions of dead air time," and "[t]hat shortened down the

interview to about two hours and ten minutes."   *Id.* at 250.   At the

conclusion of Investigator Anderson's testimony, the prosecutor played the

DVD of the interview with Sullivan.   *Id.* at 291-92.   (In the transcript, none

of the speakers are specifically identified.   *Id.* at 293-363.)   During the

interview, Sullivan appears to state he wants "peace of mind," he "can't do

nothing," and "it's every day you hear rumors running around every friggin'

where."   *Id.* at 294.   The investigator then appears to say, "We're just like

you.   We've been out there, and we're hearing rumors, too, and, you know,

we've got to get to the bottom of it.   We've got to find out what happened."

*Id.*   The part of the interview about which Sullivan appears to complain

reads as follows:

> The medical examiner done the autopsy, and the ligature marks
> around her neck, the stuff that was around her neck that you
> said she hung herself with, beyond a reasonable doubt that
> ain't what hung her.   That's what I – that's – just listen to me.
> Hear me out, now.   It's medical – these doctors are saying that
> the stuff that we collected from the tree and that was around
> her neck is not what hung her.   That's what she had on her
> when I cut her off.   I'm telling you that is exactly what was on

her when I cut her off.    I'm telling you there was no other way than what I seen right there, when I cut her down.    What was on her is and what I cut down.    Because everything – I'm talking about I left everything right there.    I dropped the knife when I'm on the phone with 911.    I'm hauling ass.    I understand that.    I understand that.    But the marks, when someone's held and is suspended, even if it's, you know, six inches, like you said, once they're hung, it's going to leave a mark all the way around their neck, okay?    And it's going to be the shape of whatever is either hanging them or if they're choked by something.    It's going to leave that mark.    Well, what was it, then?    What – that's our issue.    That's our problem.    The stuff that was around her neck that went to the hospital with her, that the other half was in the tree that you said you seen her hanging, that stuff that was around her neck is not what choked her.    Well, what – that's' not.    What was it?    What was the stuff?    I'm – it's some type of cloth, and that's our questions.    (Indiscernible.)    Listen.    Just listen to us.    Listen to us.    Concentrate and think.    I mean, we want to know the truth, and that's it.    Okay?    I mean – listen to me.    Listen to me.    Things happen, I know.    The stuff that was around her neck did not choke her, did not kill her.    The question is what is it?    That's the only – that's the only thing – Listen to us one second.    Don't say anything for a minute, okay?    In the autopsy they check the outside of the body; they check the inside of the body.    They check the issues, the bones, all the muscles, and everything in the neck.    We know for a fact that she did not die the way that you told us that she did.    Let me finish.    Just hear us out.    Okay.    We know for a fact that that happened.    Our job, as investigators, myself, him, Lieutenant Tummond, all the investigators, our job is to make sure we get it right and understand what really happened.    Okay.    Let me finish.    Let me finish.    Okay?    We know for a fact.    We have a medical examiner, a doctor, that says it did not happen the way you told us it did.    You already told me – you told me that night and you told me earlier today that she had a temper on her.    Okay?    People panic.    (Indiscernible.)    Things happen. What we want to do, we want to get this case right.    We want

to know what happened.   Now, what we know right now is she did not die from that – what was around her neck or what you told us that happened in that tree.   We know that for a fact. Don't say it again.   Okay?   But we want – what we want to know from you is understand what really happened that night. We know there was a knife outside.   Okay?   We know she had a temper.   Okay?   We need to understand what happened that night, okay?   It didn't happen like you told us. We know that.   Just listen to him.   Listen to what we got.   We got – like Sergeant Narayan says, we've got doctors at the hospital, we've got nurses at the hospital that do this for a living, that see people coming in that's hung themselves and died and all kind of trauma, and there's so much physical evidence that the normal person don't see; they deal with it. Okay?   They deal with it on, I would say, a daily basis.   And the doctors at the hospital and nurses saying this ain't right. Okay?   Now, we go to the medical examiner, a completely – somebody in the doctor's field, and they do all their examinations and said this stuff that we had that was still with Summer's body when she left the hospital to the medical examiner's office, this stuff here did not hang her.   That's – Listen to me.   Just listen to me.   Come on.   I'm trying to work with you.   I know – and listen.   We got these people that's going to say this didn't happen.   This did not happen.   This did not happen.   This stuff that we've got around her did – is not what choked her.   That ain't what choked her.   Okay?   So we know that for a fact.   Beyond a shadow of a doubt, that didn't happen.   We want to get to how it happened, okay?   I'm telling you straight – Listen to what I'm telling you.   Andy, listen to me. I'm trying – we're going to get to the bottom of it.   I told you straight up (indiscernible).   That the stuff around her neck did not choke her.   All right.   Well, they better go to another examiner because I'm telling you that is straight how I found Summer was in a tree with just like that right there.   I cut her down.   There was no other way, no other story, no other – there's nothing – there's no other way, no other anything.   The way I told you the way I cut her down, that was it.

Ex. E at 346-50.    The investigators asked a few other times about what really happened, noting "[w]e're not blowing smoke up your rear" and "[w]e're dead serious about the medical evidence," *id.* at 352, the "medical evidence is proving your theory wrong," *id.* at 354, and "we got your statement of saying what happened, and we got medical evidence that says it didn't happen," *id.* at 362.    *See id.* at 355-56, 357, 358.    Sullivan maintained he found her hanging in the tree and cut her down, *id.* at 352, 355-56, 357, 358, 359, 362.    He stated, "I don't care what they say or what the evidence says, you better send it somewhere else."    *Id.* at 352. "That's exactly how I found her, and there's no other way."    *Id.* at 356.

Sullivan appears to argue here that the prosecutor's actions in playing the DVD containing these statements bolstered "witness credibility," evidently referring to the medical examiner's opinion regarding how the victim died.    ECF No. 19 at 15.    A review of the statements quoted above, however, reflects that the investigator was relaying the information provided from the autopsy and indicating that information conflicted with Sullivan's account of how the victim died.    During his trial testimony, Investigator Anderson described, on direct, the technique he used in questioning Sullivan:

Q   All right.   So as you were going through the course of the interview, several times you interrupted Mr. Sullivan.

A   That's correct.

Q   Why?

A   Because I was trying to get his story, make sure I had my facts straight.   Going to the initial – when we started talking about what had happened, I tried to get him to be as detailed as possible in chronological order so I could figure out what happened.

Q   Is that a technique used by law enforcement to get the defendant to repeat his story to see if there are inconsistencies in it?

A   Yes, it is.

Ex. D at 147.   On cross, the investigator testified this was not the only technique law enforcement used with Sullivan.   *Id.* at 164-65; *see* Ex. E at 271-73.   The investigator further testified that he went to the medical examiner's office to review the victim's autopsy.   Ex. E at 268.   He testified he was present during the autopsy and the medical examiner's findings were not consistent with the victim having committed suicide.   *Id.* The victim's death was ruled a homicide.   *Id.*   The investigator testified he thereafter returned to the victim's residence to conduct further investigation. *Id.* at 269.   On cross, the investigator testified the medical examiner had not given him any evidence that Sullivan had committed the homicide.   *Id.*

at 279.    The investigator testified the medical examiner did state "that the

cloth that was allegedly around her neck was not the – whatever she was

killed by."    *Id*.    He testified that, during his investigation, he did not find

anything that was used to kill the victim.    *Id*. at 279-80.    Defense counsel

continued to cross-examine the investigator:

> Q   So now we're at the point of the medical examiner ruling it a
> homicide and you still have no evidence other than the fact that
> Mr. Sullivan was there that day.
>
> A   His statements, him being there alone with the victim, we
> can put her being alive at 2020 hours when she talked to Doug
> and Mr. Sullivan's statements that they were the only two there.
>
> Q   So other than the fact that he was there, you have
> absolutely no evidence that shows he killed Summer Keller;
> isn't that correct?
>
> A   That's correct.
>
> Q   You even when back to the house with a search warrant.
>
> A   Correct.
>
> Q   And you collected a wire, a rope, and an extension cord.
>
> A   There's three or four things.
>
> Q   Three or four things.   Let's say three or our four things.
>
> A   That's correct.
>
> Q   Did you send those three or four things off to FDLE to have
> them examined?

A   Yes, we did.

Q   Did you get back any evidence, anything, that connected Mr. Sullivan with those items that you sent to them?

A   No, we didn't.

Q   So at this point you still don't have any evidence that says that Mr. Sullivan killed Ms. Keller.

A   Nothing that links him to it, correct.

Q   Okay.   You interviewed 17 people, 17 people, according to the State, about Ms. Keller's death.

A   Correct.

Q   Did any of those 17 people provide you with any evidence that proved Mr. Sullivan killed Ms. Keller?

A   None of them.

Q   So you also employed some investigative techniques.

A   Correct.

Q   You wired, not one, but two different people that were around Mr. Sullivan to record his conversation.

A   I was responsible for one.

Q   Well, you were responsible for the whole investigation; isn't that correct?

A   I was the lead investigator, that's correct.

. . . .

Q   In spite of briefing them, telling them what information that you needed, wiring them, and placing them with Mr. Sullivan, you still don't have any evidence that Mr. Sullivan killed Ms. Keller, do you?

A   No.

Q   So other than the fact that Mr. Sullivan couldn't remember the order of the phone calls, which you already had, couldn't remember exactly who he talked to at what time, information you already had, on April the 19th, still with no evidence to prove that Mr. Sullivan killed Ms. Keller, you arrested him.

A   I believe we have the evidence – had enough evidence to arrest him for this case.

Q   And that evidence is the inconsistencies in the phone call.

A   That's part of it.

Q   Do you have a murder weapon?

A   No.

Q   Do you have an eyewitness?

A   No.

Q   Do you have Mr. Sullivan's DNA on anything?

A   No.

Q   Do you have Mr. Sullivan's hair on anything?

A   No.

Q   Do you have Mr. Sullivan's fingerprints on anything?

A   No.

*Id.* at 280-83.

The medical examiner, Dr. Martha Burt, also testified at trial.   Ex. F

at 431-89.   She testified, as indicated by the investigator, that the condition

of the victim's neck was inconsistent with suicide.   *Id.* at 452-67.   She

testified that she had not seen anything like the victim's condition when

performing an autopsy on a person who had hung herself.   *Id.* at 463.

She also testified that the alleged ligature used in the suicidal hanging was

not consistent with the ligature used to strangle the victim.   *Id.* at 471-72;

*see id.* at 476-78.

Given all this testimony, it is apparent that, during the recorded

interview, the investigator was relaying the information provided from the

autopsy and indicating that information conflicted with Sullivan's account of

how the victim died, in an (unsuccessful) attempt to get Sullivan to provide

an incriminating statement.   Thus, the trial court did not err in admitting the

recorded interview and no improper bolstering occurred, as alleged by

Sullivan.   *See, e.g.*, <u>Jackson v. State</u>, 18 So. 3d 1016, 1032 (Fla. 2009)

(holding trial court did not err in admitting recorded interview and

explaining:   "The statements were not admitted to prove the truth of the

matter asserted (i.e., that Cole drove Jackson to the Sumner

residence . . .).    Rather, the statements were used purely as provocation to

observe Jackson's reactions.    Police representations as to statements

made by others may be used to provoke a confession as long as the

deception does not render a confession involuntary.").    It does not appear

from a review of the transcript of the recording that the investigators

expressed their conviction in Sullivan's guilt.    *Cf.* Jackson v. State, 107 So.

3d 328, 341-42 (Fla. 2012) (distinguishing Jackson, 18 So. 3d at 1032, and

holding trial court abused its discretion in admitting recorded interview

where, among other things, "even to the extent the detectives' statements

did yield somewhat relevant responses, this evidence should not have

been admitted as the probative value of Jackson's statements is minimal

when juxtaposed with the inappropriate statements by the detectives"

where detectives expressed opinions about defendant's credibility, guilt,

and weight and sufficiency of evidence and admission of statements "also

permitted the State to improperly elicit sympathy for [victim] as a basis for

Jackson's culpability with facts not otherwise in the record").

Based on the foregoing, Sullivan has not shown that, even if

considered on the merits, the state courts' ruling rejecting this claim

resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   *See* 28 U.S.C. § 2254(d)(1)-(2).   This ground should be denied.

### Ground 3:   Hearsay

In his third ground, Petitioner Sullivan appears to challenge a provision of Florida's Evidence Code, section 90.801(1)(c), Florida Statutes.   ECF No. 19 at 15-16.   As Respondent indicates, Sullivan did not raise this ground in state court.   *See* ECF No. 34 at 34.   Accordingly, this ground is unexhausted and procedurally defaulted.   *See* O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999) ("Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court."); *see also, e.g.*, McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005) (explaining exhaustion requirement: "[T]o ensure that state courts have the first opportunity to hear all claims, federal courts have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."); Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001) ("[I]f the petitioner has failed to exhaust state remedies that are

no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable."); Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010) (explaining "[a] federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation" or if fundamental miscarriage of justice exists because "'a constitutional violation has probably resulted in the conviction of one who is actually innocent'" (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986))).

Assuming Sullivan demonstrated cause and prejudice to excuse the procedural default, this ground lacks merit and should be denied.   As Respondent indicates, the Florida statute is essentially the same as Federal Rule of Evidence 801(c)(2), which has not been found unconstitutional.   ECF No. 34 at 34.

### Ground 4:   IAC – No Expert Witness

In his fourth ground, Petitioner Jones asserts trial counsel provided ineffective assistance by not hiring an expert witness to provide a second opinion regarding the victim's cause of death.   ECF No. 19 at 16. Respondent indicates Petitioner raised this claim, or a sufficiently similar

claim, in state court in his Rule 3.850 motion.   ECF No. 34 at 34; *see* Ex. N

at 7-10.   The state post-conviction court denied the claim after an

evidentiary hearing and made extensive findings, quoted at length here

with citations in brackets to the portions of the state court record that

supports those findings:

> As to ground (C), Defendant alleges that trial counsel was ineffective for failing to "obtain the services of a forensic pathologist or other expert in ligature marks".   Specifically Defendant argues that had trial counsel employed a forensic pathologist or expert in ligature marks, trial counsel would have been better prepared to cross-examine the medical examiner as well as being able to put on its own expert witness to support the defense's theory that the victim committed suicide.   During the evidentiary hearing on Defendant's motion for post-conviction relief, Defendant testified on direct examination that when trial counsel took over as his defense counsel, he asked trial counsel to obtain a medical examiner or a forensic expert to assist him with his case.   [Ex. Q at 83.]   Defendant also testified that he never withdrew this request.   [Ex. Q at 83.] During rebuttal, Mr. Bryant testified that Defendant never asked him to hire a medical examiner, forensic pathologist, and/or a ligature expert.   [Ex. Q at 133.]
>
> During the evidentiary hearing, Defendant called Peter Gillespie, M.D. to testify on his behalf about his findings regarding the cause and manner of the victim's death and whether or not he believed a forensic pathologist could have assisted the defense in trial preparation.   Dr. Gillespie was not presented to the court as a ligature mark expert, but qualified before this Court as a forensic pathologist.   [Ex. Q at 18.] However, it should be noted that Dr. Gillespie is not a board certified forensic pathologist or a board certified anatomic and clinical pathologist either.   [Ex. Q at 12.]   Dr. Gillespie testified

that he took the general pathology exam, for the certification as an anatomic and clinical pathologist, three to four times, but was not able to pass that examination.   [Ex. Q at 12.]   He further testified that he was never eligible to take the exam to be certified in forensic pathology as he never passed the general pathology exam.   [Ex. Q at 12.]   Dr. Gillespie indicated that he is no longer eligible to take the general pathology exam as his eligibility has expired.   [Ex. Q at 12-13.]   Additionally, he testified that he has not published any articles.   [Ex. Q at 13.]   Dr. Gillespie testified that he has performed approximately 3,000 forensic autopsies and of those autopsies, 150-200 of them were suicidal hangings with one exception being an accident.   [Ex. Q at 6, 16-17.]   He further testified that he performed 10-12 autopsies which were caused by homicidal strangulation; and approximately half of those autopsies were caused by a ligature, and half were by manual strangulation. [Ex. Q at 14-15.]

Dr. Gillespie's qualifications starkly contrast with Dr. Martha Burt's qualifications.   Dr. Burt is the medical examiner who testified at Defendant's jury trial.   Dr. Burt had been a board certified forensic pathologist since 2002 and an anatomic and clinical pathologist since 2001.   *See* Dr. Burt's Curriculum Vitae [Ex. O at 230-33].   Dr. Burt has published articles and has been associated with many publications in her field.   Dr. Burt is also a professor at the University of Florida in the field of pathology.   *Id.*   During Defendant's jury trial, Dr. Burt testified that she had performed close to 2500 autopsies.   *See* Jury Trial Transcript at 433 (lines 17-18) [Ex. F at 433].   She further testified that she had been involved with approximately an additional 300 autopsies.   *Id.* at 433 (lines 19-21) [Ex. F at 433].   Dr. Burt testified that she had performed 120-360 autopsies on people who have hanged themselves.   *Id.* at 435 (lines 1-10) [Ex. F at 435].   She further testified that of those autopsies, 12-24 of them involved a cloth ligature, and approximately less than five of those hangings were actually homicides.   *Id.* at 435 (line 11) - 436 (line 5), and 436 (lines 6-17) [Ex. F at 435-36].

During Dr. Gillespie's direct examination he testified that a
forensic pathologist takes the physical findings of the autopsy
together with ancillary studies, puts that information together
with any information that can be gleaned from records, and
takes all of that information to determine a cause and manner
of death.  [Ex. Q at 101-02.]   He testified that a forensic
pathologist would render an opinion about whether or not a
death was a suicide or homicide if there was enough
information, but sometimes a determination cannot be made.
[Ex. Q at 102.]   Dr. Gillespie testified in preparing to render an
opinion in Defendant's case he reviewed the investigative
report from the medical examiner, Dr. Burt's autopsy report,
copies of Dr. Burt's autopsy diagrams, the toxicology report, a
DNA report, evidence obtained in the case from ligatures and
suspected ligatures, medical records from the victim's
hospitalizations, transcripts of Dr. Burt's deposition and trial
testimony, the state attorney's investigative report, transcript of
trial counsel's deposition regarding matters from Defendant's
post-conviction relief motion, photographs from the scene of the
incident including inside Defendant's and victim's residence,
and autopsy photographs.  [Ex. Q at 102-03.]   Dr. Gillespie
testified the he believed a forensic pathologist would have
easily helped the defense in raising reasonable doubt
concerning the manner of death during the trial.   [Ex. Q at
105.]   He further testified that it is his opinion that the victim's
death should have been classified as a suicide or at the very
least undetermined.   [Ex. Q at 106, 115, 123.]   He further
testified that he could only make a determination with a
reasonable degree of medical certainty that the victim's death
should have been classified as undetermined.   [Ex. Q at 123-
24.]   However, Dr. Gillespie did not say this about his opinion
with regards to the victim's death being a suicide.   Dr. Gillespie
testified that he based his opinion on the following information:
1) the direction of the victim's furrow[], he testified that a furrow
in a homicide is horizontal, and the furrow on the victim's right
side of her neck angled up very sharply and on the left side it
was less sharp; 2) the width of the furrow, he testified that the

furrow on the victim was variable, not uniform, as it varied from one centimeter to half a centimeter which he believes is a little more consistent with a fabric than a cable; 3) the fact that the thyroid cartilage was intact on the victim, which Dr. Gillespie testified is more consistent with suicidal hangings because people usually apply a lot of pressure when they strangle a victim; 4) the position of the victim's tongue, the victim's tongue was protruding from her mouth which Dr. Gillespie said is more consistent with a suicide and is a common finding in suicides because the ligature causes pressure on the throat which forces the tongue out; and 5) the fact that the victim did not have any marks on her neck from a struggle.   [Ex. Q at 106-12, 127-28.]

During the jury trial, Dr. Burt testified that she came to the conclusion that the victim's death was a homicide based upon: 1) looking at the victim's injuries and whether or not they were consistent with the way the death was presented to her; 2) looking at the possible ways the injuries on the victim could have happened, the injuries on the victim's neck, the degree of soft-tissue trauma; and 3) the fact that the orientation of the ligature furrow was very inconsistent with a self-inflicted injury. *See* Jury Trial Transcript at 481 (line 12) - 482 (line 13) [Ex. F at 481-82].   With regards to the victim's furrow, at trial Dr. Burt testified that the furrow angle did not go up sharply like she would expect in a hanging.   *See* Jury Trial Transcript at 453 (line 24) - 454 (line 22), 456 (lines 11-25), and 457 (lines 6-12) [Ex. F at 453-54, 456-57].   However, Dr. Burt stated that in one of the pictures it appear[s] as if the furrow line is going up.   *Id.* at 454 (lines 2-5) [Ex. F at 454].   Dr. Burt testified that in strangulations with a cloth, the furrow is more irregular compared to using other objects.   *Id.* at 443 (lines 9-19) [Ex. F at 443].   Dr. Burt testified that the change of the furrow from a half of a centimeter to a centimeter is a little bit of a difference, but not much of a difference.   *Id.* at 451 (line 19) - 452 (line 1) [Ex. F at 451-52].   She also testified that the change in victim's furrow width was consistent with the ligature being the cloth, but it was not inconsistent with it being caused by another ligature

either.   *Id.* at 452 (lines 2- 15) [Ex. F at 452].   Dr. Burt also
testified that fabric will tend to leave an imprint on the person.
*Id* at 443 (line 19) - 444 (line 3) [Ex. F at 443-44].   She did not
find a pattern imprinted on the victim. *Id.* at 472 (lines 7-10) [Ex.
F at 472; *see id.* at 478].   Dr. Burt testified that in a hanging,
the ligature mark should be above the thyroid cartilage, but it
was not.   *Id.* at 452 (lines 20) - 453 (line 10) [Ex. F at 452-53].
Dr. Burt also testified that when a person hangs herself, there is
not a lot of pressure needed to cut off the vessels which
ultimately causes the person to die. *Id.* 463 (line 8) - 464 (line
13) [Ex. F at 463-64].   Dr. Burt testified that that is why she did
not expect to see the deep-tissue hemorrhaging she saw on the
victim.   *Id.* at 464 (lines 12-13) and 467 (lines 1-6) [Ex. F at
464, 467].   Dr. Burt also testified that there were bruises all
over the victim's body.   *Id.* at 468 (line[] 8[)] - 470 (line 19) [Ex.
F at 468-70].

        During the evidentiary hearing, Dr. Gillespie also testified
that a forensic pathologist would have been able to contradict
Dr. Burt's testimony and would have helped the defense be
more prepared to cross-examine Dr. Burt about her
interpretation of the findings.   Dr. Gillespie stated that Dr. Burt
thought the furrow markings were inconsistent with a suicide,
and he did not.   [Ex. Q at 112-13, 127.]   Dr. Burt testified that
the furrow angle did not go up sharply like she would expect in
a hanging.   *See* Jury Trial Transcript at 453 (line 24) - 454 (line
22), 456 (lines 11-25), and 457 (lines 6-12) [Ex. F at 453-54,
456-57].   However, Dr. Burt stated that in one of the pictures it
appear[s] as if the furrow line is going up.   *Id.* at 454 (lines 2-5)
[Ex. F at 454].   This may be why Dr. Gillespie's opinion is
contrary to Dr. Burt's testimony at trial.   Dr. Gillespie also
testified that Dr. Burt thought the hemorrhage in the victim's
neck is not consistent with hanging, but Dr. Gillespie testified
that hemorrhaging is seen in strangulations although it is not
common in suicidal hanging.   [Ex. Q at 113.]   Dr. Burt testified
that this is not a normal finding in a hanging.   *Id.* at 449 (lines
22-24), and 463 (line 9)- 464 (line 13) [Ex. F at 449, 463-64].
She did not testify a hemorrhage could not ever happen as a

result of a hanging.   Thus, Dr. Gillespie's testimony does not appear to be contradictory to Dr. Burt's testimony.   Additionally, during her cross-examination at the jury trial by Defendant's trial counsel, Dr. Burt testified that hemorrhages could be have be healed on the outside, but not on the inside and vice versa.   *Id.* at 486 (lines 8-23) [Ex. F at 486].   Therefore, implying that the hemorrhage could be from an old injury.

Dr. Gillespie also testified that Dr. Burt should have been questioned about the outside evidence that she had reviewed as the victim's psychiatric history is important, whether or not a person is using or abusing alcohol or drugs is important, and whether or not the victim had any other risk factors that would have made it more likely that she would take her own life.   [Ex. Q at 114, 117.]   He further testified that Mr. Bryant did not ask any of those types of questions.   [Ex. Q at 117.]   On cross-examination, Dr. Gillespie testified that he does not know if Dr. Burt took any of those factors into account when she rendered her opinions.   [Ex. Q at 120-21.]

On cross-examination, Dr. Gillespie testified that he did not actually see any of the possible ligatures, only pictures of them.   [Ex. Q at 119-20, 124.]   He testified that he could only tell that the fabric ligature was variable, but did not know how much the fabric itself varied in width based upon the pictures. [Ex. Q at 120, 124.]   He also stated that he was not able to see a pattern in the cloth, but later testified that in one of the pictures he was able to see a pattern from the fabric on the victim.   [Ex. Q at 125-26.]   Dr. Gillespie further testified that the pattern on the victim could have changed based upon the period of time that passed between the time the victim hanged herself and the time she died.   [Ex. Q at 126.]   He also testified that a fabric that was 8-12 inches wide could have made a ligature mark of .5-1 centimeters wide.   [Ex. Q at 127.]

During Defendant's trial, Dr. Burt testified trial that she was brought the cloth ligature.   *Id.* at 471 (lines 10 -21) [Ex. F at 471].   She further testified that no pattern was present on

the victim which was part of the reason she thought the cloth was not the ligature.   *Id.* at 472 (lines 7 -12) [Ex. F at 472; see id. at 477-78].   Additionally, she testified that the width of the furrow could not have been made by fabric because the width of the fabric could not have made this sized furrow.   *Id.* at 472 (lines 3-6) [Ex. F at 472].

Dr. Gillespie testified that he reviewed the other bruises on the victim's body, but not in great detail because that was a periphery issue.   [Ex. Q at 129.]   He further stated that these bruises could or could not be related to what happened on the night of April 8, 2011.   [Ex. Q at 129-30.]   However, Dr. Burt found those bruises to be very important in making her determination about the victim's death as stated previously. Dr. Gillespie also testified that he did not read the entire trial transcript, but only Dr. Burt's testimony which might also explain why he and Dr. Burt differed on whether or not the additional bruises on the victim's body were important.   [Ex. Q at 119.]

During the direct examination of Mr. Bryant at the post-conviction relief hearing, Mr. Bryant testified that he had considered hiring an expert to assist with Defendant's case, but after discussion with other experienced attorneys he discovered that there was not an issue as to the cause of the victim's death which is what a forensic pathologist would have been used to determine.   [Ex. Q at 25-26, 28; *see id.* at 40.]   When questioned by Defendant's post-conviction relief counsel, Mr. Bryant testified that everyone agreed that the cause of death was asphyxiation, but there was a disagreement with regards to the mechanics used to cause the victim to die by asphyxiation. [Ex. Q at 23-24, 26, 28.]   He further testified that he was able to get Dr. Burt to admit that she could not conclusively determine whether or not the victim died as a result of manual or ligature strangulation.   [Ex. Q at 29.]   He testified that he got Dr. Burt to make this same statement during her deposition which was part of the reason he chose not to hire a forensic pathologist.   [Ex. Q at 29.]   He further testified that he did not

want to have another person come to the same conclusions as Dr. Burt.   [Ex. Q at 29.]   Mr. Bryant testified that Dr. Burt's testimony supported both the state's and the defense's theory concerning the mechanics of the victim's death.   [Ex. Q at 31-32.]   Mr. Bryant also testified that Dr. Burt's inability to make a definitive determination about the mechanics of how the victim died supported his understanding that forensic pathologists determine[] the cause of death and not the mechanics of how that death occurred.   [Ex. Q at 31-32.]

On cross-examination, Michael Bryant testified that he fully discussed the case with Defendant and also discussed the case with Defendant's mother and sister-in-law.   [Ex. Q at 34.] He further testified that he discussed which witnesses he intended to call on Defendant's behalf.   [Ex. Q at 36-37.]   Mr. Bryant testified that he went over Dr. Burt's testimony after taking her deposition and discussed with him and his family members what he believed she could and could not testify about with regards to Defendant's case.   [Ex. Q at 37-38.] When asked if Defendant ever asked him to hire an expert witness, Mr. Bryant initially testified that Defendant's understanding of the legal issues in his case were limited and would end with Defendant stating "whatever you think is best". [Ex. Q at 38-39.]   Mr. Bryant also stated that Defendant's sister-in-law was the person who understood the most about the case and Mr. Bryant's strategy, but he urged Defendant's family and Defendant not to discuss the case with Defendant because their conversations with Defendant were not protected.[]   [Ex. Q at 39-40.]   He did not want the state to learn his trial strategy.   [Ex. Q at 40.]   When questioned further about why he did not hire a forensic pathologist, Mr. Bryant testified that after taking Dr. Burt's testimony he knew she did not have a strong opinion about the mechanics of the victim's death and decided to exploit that issue at trial as another way to create reasonable doubt.   [Ex. Q at 41.]

Mr. Bryant further testified that at trial he asked Dr. Burt whether or not the furrow on a victim's neck could have been

different if the body was partially suspended.   [Ex. Q at 41-44.] He further testified that this fact was important because Dr. Burt testified that the furrow was not consistent with a suspended hanging.   [Ex. Q at 42.]   He was able to get Dr. Burt to admit that a partial suspension could change the expected direction of the ligature marks.   [Ex. Q at 43.]   During the trial, Dr. Burt had stated that the cloth that was found around the victim's neck would not have made those marks.   Mr. Bryant testified that he got Dr. Burt to admit that the fat in a person's neck could cause a change in the ligature marks.   [Ex. Q at 45.]   Mr. Bryant also testified that he was able to stop Dr. Burt from testifying about the ligature used in this case which he did to create doubt about whether or not Dr. Burt was qualified to testify about the mechanics of the victim's death.   [Ex. Q at 45.]   Mr. Bryant also testified that he was able to get Dr. Burt to admit that the hemorrhaging that she found in the victim's neck could have been from an old injury.   [Ex. Q at 45-46.]   He testified that Dr. Burt was attributing the hemorrhaging to a blow to the victim which could have been caused by Defendant even though there were no visible marks on the outside of the victim's body.   [Ex. Q at 46.]   Mr. Bryant testified that by getting her to admit that this could have been an old injury this would help support the idea that the victim hanged herself.   [Ex. Q at 46.]   He also was able to get Dr. Burt to admit that some of the bruising on the victim's body could have been caused by people preforming [sic] CPR on the victim when she was on the ground.   [Ex. Q at 49-50.]   This was important since Dr. Burt was using this information to support the idea that the victim's death was a homicide and not a suicide.   [Ex. Q at 50.]   He also testified that he got Dr. Burt that admit that she found no evidence on the victim's body which connected Defendant to victim's death. [Ex. Q at 50.]   Mr. Bryant testified that he ultimately got Dr. Burt to admit that it was not impossible for the victim to have hanged herself.   [Ex. Q at 51.]   Trial counsel's testimony is supported by the [trial transcript in the] record.   *Id.* at 484 (line 20) - 485 (line 3), 485 (line 10) - 486 (line 3), 486 (lines 4 -7), 486 (lines 8) - 488 (line 6), and 488 (lines 7-11) [Ex. F at 484-88].

Also on cross-examination, trial counsel testified that he was also able to point out that there were no marks on the victim that were consistent with her being rendered unconscious by a blow, she had no defensive wounds or marks on her, Defendant's DNA was not found on the victim or any of the suspected ligatures, and there were no signs of a struggle. [Ex. Q at 42-43, 51-52.]  On re-direct, Mr. Bryant testified that if he had an opinion from an expert that the victim's death was a suicide he would have put forth that evidence during trial.  [Ex. Q at 73.]

Post-conviction relief counsel argues that trial counsel's failure to hire a forensic pathologist rendered his investigation of Defendant's case incomplete.   Post-conviction relief counsel argues that the state's case solely hinged upon Dr. Burt's testimony and the testimony from Investigator Anderson about Defendant's failure to remember the sequence of the phone calls he made the night of April 8, 2011.   Post-conviction relief counsel argued that trial counsel's deposition testimony that the jurors reached the verdict of manslaughter as a compromise further emphasizes how important that testimony was to the state's case.   During the post-conviction relief hearing, post-conviction relief counsel questioned Mr. Bryant about that deposition statement.   [Ex. Q at 32-33.]   Mr. Bryant testified that he stated that the juror told him that there was a compromise by the jury, but he never stated that the jurors thought this case could go either way.   [Ex. Q at 33.]   The State presented two affidavits with its written closing arguments which supports Mr. Bryant's testimony at the hearing.   [Ex. O at 241-42.]   Those affidavits state that there was only one juror who was holding a not guilty vote.

In the state's closing written arguments, it pointed out evidence, aside from Defendant's inconsistent sequence of phone calls and Dr. Burt's statements, which supported the state's theory about how the victim's death occurred.   [Ex. O at 218-25.]   First, the state pointed out that at trial, it showed that Defendant would not have been able to cut the victim down

from the tree at the height necessary for the cloth to suspend the victim. *Id.* at 481(line 5), 177 (line 19), 227 (line 3), 328 (line 24) - 329 (line 10), 331 (line 6-8), and 662 (line 23) - 672 (line 6) [Ex. F at 481; Ex. E at 177, 227, 328-31; Ex. G at 662-72].   Second, during the closing arguments at Defendant's trial, the state tried to cut the cloth, which was the alleged ligature, with the knife that Defendant claimed he used that night to cut the victim down.   The state could not cut that cloth ligature with that knife. *Id.* at 672 (lines 11 -18) [Ex. G at 672].   Third, the neighbor that Defendant summoned for help that night was an emergency room nurse who found the victim with no pulse, no signs of breath, and eyes that were fixed, glassed over and dried. *Id.* at 55 (line 11), 57 (lines 8-9, 17-18), and 62 (lines 11-19) [Ex. D at 55, 57, 62].   Fourth, the state also presented evidence which showed Defendant changing the sequences of events that occurred on April 8, 2011.   Defendant initially told Investigator Anderson that he was on the phone with his friend Jimbo when he discovered the victim hanging in the tree. *Id.* at 138 (lines 3-14) [Ex. D at 138].   Later he told Investigator Anderson that he was not on the phone with Jimbo during that time. *Id.* at 141 (lines 2-8) and 142 (lines 11-17) [Ex. D at 141-42].   Then later he stated that he hung up the phone with Jimbo to call 911. *Id.* at 177 (lines 12-14) [Ex. D at 177]. Defendant's story also changed with regards to when he cut the victim down from the tree. *Id.* at 144 (lines 1-5), 177 (lines 13-15), and 319 (lines 21-22) [Ex. D at 144, 177; Ex. E at 319]. Fifth, there was a lot of evidence which showed the victim was not suicidal.   Defendant told law enforcement that the he did not know of a time that the victim wanted to harm herself. *Id.* at 181 (lines 8-9) [Ex. D at 181].   The state also presented multiple witnesses who stated that the victim was against suicide and would become angry when people suggested committing suicide. *Id.* at 403 (lines 2-20), 414 (lines 8-23), 419 (lines 8-13), and 428 (line13) - 429 (line 19) [Ex. F at 403, 414, 419, 428-29].   Sixth, at trial the state put on evidence that the victim's knee was causing her pain the day of the incident, and she had to wear her knee brace. *Id.* at 425 (lines 2-25) [Ex. F at 425].   The state presented a witness which stated that

the victim had had trouble climbing the stairs of her home a week prior when she was experiencing knee pain.  *Id.* at 426 (1-19) [Ex. F at 426].   The only way the victim could have fully suspended herself from the tree was to climb the tree or the fence next to the tree which would have been difficult since the victim was experiencing knee pain that day.   Seventh, during the trial, the state put forth evidence which suggested Defendant had a motive to harm the victim as they had been fighting, and she was close to leaving him.  *Id.* at 131 (lines 20-22), 132 (lines 5-10), 135 (lines 1-7), 179 (line 24)-180 (line 3), 180 (line 17)- 181 (line 1), 413 (lines 23-25) [Ex. D at 131-32, 135, 179-81; Ex. F at 413].   Eighth, Defendant also failed to tell law enforcement that the victim threw the phone at his head during their argument until Investigator Anderson confronted him about this; instead Defendant told law enforcement that the victim either gave him or let him hold the phone.   *Id.* [at] 341 (line 18)-342 (line 25), 138 (lines 2-3), 139 (lines3-6), 176 (lines 15-16), 180 (lines 12-13), and 184 (lines 14-16) [Ex. E at 341-42; Ex. D at 138-39, 176, 180, 184].   Lastly, during the trial, the state showed that Defendant did not act like a boyfriend who was concerned about his girlfriend during the time she was in the hospital.   *Id.* at 261 (line 20)-262 (line 9), 520 (lines 13-17), 521 (lines 9-14), 525 (lines 1-23), 528 (lines 19-25), 531 (lines 2-19), and 392 (lines 5-25) [Ex. E at 261-62; Ex. F at 520-21, 525, 528, 531; Ex. E at 392].

During the evidentiary hearing, trial counsel testified that he spoke to his supervisor as well as other attorneys about Defendant's case.   [Ex. Q at 25-26, 28; *see id.* at 40.]   Trial counsel testified that he figured out during Dr. Burt's deposition that her testimony would not exclude Defendant's theory about the victim's death, suggesting that there were areas he could press Dr. Burt on in order to raise reasonable doubt about her conclusions.   [Ex. Q at 23-29, 41.]   He also testified that he knew he could keep her from testifying about certain issues. [Ex. Q at 37-38, 45.]   He further testified that he did not make a decision to not hire a forensic pathologist until after Dr. Burt's deposition.   [Ex. Q at 29.]   He also testified that he spoke with

his investigators to help him come up with ways to make the evidence consistent with Defendant's theory about how the victim died.   [Ex. Q at 42-45.]   Additionally, Defendant's expert forensic pathologist could not conclusively classify the victim's death as a suicide; and trial counsel was concerned that if he hired a forensic pathologist, that pathologist might have come to the same conclusions as Dr. Burt who classified the victim's death as a homicide.   [Ex. Q at 29.]   Trial counsel was able to get Dr. Burt to admit that she only classified the victim's death as a homicide by a preponderance of the evidence.   *Id.* at 488 (lines 7-11) [Ex. F at 488].   Dr. Gillespie also testified that he only reviewed the pictures of the autopsy and pictures of the proposed ligatures used to cause the victim's death.   [Ex. Q at 119-20, 124.]   Dr. Gillespie testified that Dr. Burt should have been challenged on her interpretation about the ligature marks on the victim's neck.   He testified that on the right side, the furrow went up sharply.   Based upon Dr. Burt's testimony at the trial, she stated that one of the photographs made it appear as if the furrow went upward, but she testified that the furrow only went up slightly.   *Id.* at 453 (line 24) - 454 (line 22), 456 (lines 11-25), and 457 (lines 6-12) [Ex. F at 453-54, 456-57]. Trial counsel was able to get Dr. Burt to admit that if the victim was partially suspended it could have changed the furrow markings.   *Id.* at 484 (line 20) - 485 (line 3) and 486 (lines 4-7) [Ex. F at 484-86].   He also got her to admit that the amount of fat in a person's neck could affect the furrow markings as well. *Id.* at 485 (line 10) - 486 (line 3) [Ex. F at 485-86].   Dr. Gillespie also testified that Dr. Burt should have been challenged on her interpretation of the hemorrhage found on the victim's neck. Trial counsel did exactly as Dr. Gillespie suggested.   *Id.* at 486 (lines 8) - 488 (line 6) [Ex. F at 486-88].   Based upon the fact that trial counsel consulted others, used his investigators to assist him in finding ways to attack Dr. Burt's conclusions, deposed Dr. Burt and successfully got her to retract from many of her statements, and had concerns that a forensic pathologist might have come to the same conclusions as Dr. Burt, trial counsel's strategic decision not to hire a forensic pathologist did not fall below the prevailing professional standards.

Ex. P at 357-71.   On appeal, the First DCA affirmed without a written opinion.   This constitutes a ruling on the merits and is entitled to AEDPA deference.   *See* 28 U.S.C. § 2254(d); Harrington, 562 U.S. at 98-100.

The state court record supports the post-conviction court's findings, as reflected by the record citations in brackets, *supra*.   Further, to the extent the state post-conviction trial judge accepted the testimony of trial counsel over that of Sullivan and Dr. Gillespie, that judge sits as the fact-finder and determines witness credibility in Rule 3.850 proceedings.   *See, e.g.*, Consalvo v. Sec'y for Dep't of Corr., 664 F. 3d 842, 845 (11th Cir. 2011); Smith v. State, 697 So. 2d 991, 992 (Fla. 4th DCA 1997); Fla. R. Crim. P. 3.850(d).   "Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor was observed by the state court, but not by them.'"   Consalvo, 664 F.3d at 845 (quoting Marshall v. Lonberger, 459 U.S. 422, 434 (1983)).

Moreover, as the state court concluded, trial counsel made a strategic decision not to hire an expert forensic pathologist.   *See, e.g.*, Strickland, 466 U.S. at 690-91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."); Waters v. Thomas, 46 F.3d 1506, 1518-19 (11th Cir. 1995) (en

banc) ("We cannot, and will not, second guess such [strategic] decisions" that "trial counsel are called upon to make."); <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994) ("Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so.").   Indeed, at least to some extent, this strategy appears to have succeeded as the jury found Sullivan guilty of the lesser offense of manslaughter, rather than the charged offense of first degree murder.

Petitioner Sullivan has not shown that the state court's rejection of this ground involved an unreasonable application of clearly established federal law or that it was based on an unreasonable determination of the facts.   *See* 28 U.S.C. § 2254(d)(1)-(2).   Accordingly, this ground should be denied.

## Conclusion

Petitioner Gary Andrew Sullivan is not entitled to federal habeas relief.   The second amended § 2254 petition (ECF No. 19) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by objections to this Report and Recommendation.

Leave to appeal in forma pauperis should also be denied. *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not

otherwise entitled to appeal in forma pauperis).

## <u>Recommendation</u>

It is therefore respectfully **RECOMMENDED** that the Court **DENY** the

second amended § 2254 petition (ECF No. 19).   It is further

**RECOMMENDED** that a certificate of appealability be **DENIED** and that

leave to appeal in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on June 28, 2018.

<u>**S/ Charles A. Stampelos**</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.**

Fed. R. Civ. P. 72(b)(2).   A copy of the objections shall be served upon all other parties.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   Fed. R. Civ. P. 72(b)(2).   <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>.   If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.   *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.